No. 23-3038

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

UNITED STATES OF AMERICA

*Plaintiff-Appellee*,

v.

BRITTANY JONES

*Defendant-Brittany Jones*.

_____

On Appeal from the United States District Court for the District of Columbia in
Case No. 19-CR-307-2 (Hon. Royce C. Lamberth)

_____

**BRIEF OF BRITTANY JONES**

Antoini M. Jones

Counsel for *Defendant-Brittany Jones*

# I.  TABLE OF CONTENTS

I. TABLE OF CONTENTS .................................................................. i

II. TABLE OF AUTHORITIES ......................................................... ii

III. JURISDICTION..................................................................... 1

IV. STATEMENT OF ISSUES FOR APPEAL ................................... 1

V. STATEMENT OF THE CASE..................................................... 2

VI. STATEMENT OF FACTS ......................................................... 3

VII. SUMMARY OF ARGUMENT .................................................. 19

VIII. ARGUMENT ...................................................................... 19

    (A) Brittany Jones's conviction of Count 5 was the result of a prejudicial variance
        From the single conspiracy charged in the Indictment to the evidence of multiple
        conspiracies at trial……………………………………………………………...19

    (B) Trial Counsel Rendered Ineffective Assistance of Counsel to Brittany Jones that
        violated her Sixth Amendment Rights……………..……………………………..26

        (a) Trial Counsel rendered ineffective assistance of Counsel by not adequately
            investigating Possible Impeachment evidence to attack the Critical Cellphone
            Extraction Data Presented Against Brittany Jones…………………………..28

        (b) Trial Counsel rendered ineffective assistance of Counsel by not objecting to
            testimony regarding cellphone communications of Brittany Jones that
            occurred prior to the alleged Conspiracy.………………………………..32

IX. CONCLUSION…………………………………………………………34

X.  CERTIFICATE OF COMPLIANCE…………………………………35

XI. CERTIFICATE OF SERVICE…………………………………………..36

## II. TABLE OF AUTHORITIES

### *Cited Cases*

*Engle v. Isaac*, 456 U.S. 107 (1982) .................................................................. 29

*Gaither v. United States*, 413 F.2d 1061 (D.C. Cir. 1969)…………………..20,25

*Lord v. Wood*, 184 F.3d 1083 (9th Cir. 1999) ..................................................... 29

*McMann v. Richardson*, 397 U.S. 759 (1970) .................................................... 27

*Reynoso v. Giurbino*, 462 F.3d 1099 (9th Cir. 2006) .................................... 29,31

*Strickland v. Washington*, 466 U.S. 668 (1984) ............................ 26,27,28,31,32

*Tucker v. Ozmint*, 350 F.3d 433 (4th Cir. 2003) ................................................ 29

*United States v. Caporale*, 806 F.2d 1487 (11th Cir. 1986) .............................. 21

*United States v. Eiland*, 525 F.Supp. 2d 37 (D.D.C. 2007) ...................... 21,24,25

*United States v. Fahra*, 643 Fed.Appx. 480 (D.C. Cir. 2016)………………20,21

*United States v. Gaviria*, 116 F.3d 1498 (D.C. Cir. 1997) ........................... 21,23

*United States v. Glover*, 174 F.Supp.3d 431 (D.D.C. 2016) ......................... 32,34

*United States v. Henry*, 472 F.3d 910 (D.C. Cir. 2007)..................................... 26

*United States v. Hitt,* 2000 U.S. Dist. LEXIS 9931 (D.D.C. 2000)................... 24

*United States v. Hughes*, 505 F.3d 578 (6th Cir. 2007)…………………….…...20

*United States v. Mathis*, 216 F.3d 18 (DC. Cir. 2000) ........................ ……. 21,23

*United States v. Ogando*, 1991 U.S. Dist. LEXIS 3774 (S.D.N.Y. 1991) ......... 33

*United States v. Pembrook*, 119 F.Supp. 3d 577 (E.D. Mich. 2015).................. 31

*United States v. Shabban*, 612 F.3d 693 (D.C. Cir. 2010)........................ 28,32,34

*United States v. Tarantino*, 846 F.2d 1384 (D.C. Cir. 1988)……………..21,24,25

*United States v. Weathers*, 493 F.3d 229 (D.C. Cir. 2007) ................................ 27

*United States v. Weaver*, 281 F.3d 228 (D.C. Cir. 2002) ................................... 26

*United States v. Wood*, 879 F.2d 927 (D.C. Cir. 1989) ................................. 33,34

### *Cited Statutory Provisions*

U.S. Const., Amend. VI ........................................................................................ 26

18 U.S.C. §1591……………………………………………………………………13

18 U.S.C. §1594……………………………………………………………13,20, 22

18 U.S.C. §1952……………………………………………………………………13

18 U.S.C. §2421…………………………………………………………....…13

18 U.S.C. §2423…………………………………………………………..13

28 U.S.C. §1291………………………………………………..…………….1

## III.  JURISDICTION

This is an appeal from a jury trial and a final order from the United States District Court for the District of Columbia. This Court has jurisdiction pursuant to 28 U.S.C. §1291.

Final judgment in the form of a sentence was entered on March 3, 2023. Pursuant to Fed. R. App. Pro 4(b)(1)(A), a timely Notice of Appeal was filed on March 16, 2023.

## IV.  ISSUES PRESENTED FOR APPEAL.

1.  Whether Brittany Jones suffered prejudice warranting her conviction as to count 5 being vacated due to the variance from the indictment charging a single conspiracy and the evidence at trial demonstrating two conspiracies?

2.  Whether trial counsel rendered ineffective assistance of counsel by not employing an independent expert to analyze and refute the accuracy of cellphone tracking data the Government introduced as evidence against Brittany Jones?

3.  Whether trial counsel rendered ineffective assistance of counsel by not objecting to the introduction of text messages between Brittany Jones and another individual that preceded the date of the charged conspiracy?

4.  Whether there was sufficient evidence of Ms. Jones' involvement in a crime to warrant a finding of guilt beyond a reasonable doubt?

## V.  STATEMENT OF THE CASE

Ms. Brittany Jones ("Brittany Jones") brings this appeal challenging the sufficiency of the evidence to convict her of count 5 of the Indictment, and the adequacy of the representation she received from her trial counsel, Ernie McIntosh, Esquire.

As evident from the arguments herein, and the record, there was a variance in the charged conspiracy in the indictment and the evidence presented at trial as to count 5 resulting in insufficient evidence to support her conviction, and trial counsel rendered ineffective assistance of counsel on two grounds, (1) by not adequately investigating possible methods to attack the accuracy of the historical cellphone data to be used against Brittany Jones leading to trial counsel's failure to cross examine Agent Wilde as to the topic, and (2) failing to object to communications between Brittany Jones and another individual taking place prior to the charged conspiracy from being introduced and read to the jury.

The insufficient evidence to support count 5 of the Indictment warrants vacating Brittany Jones' conviction as to that count. Additionally, trial counsel's ineffective assistance of counsel violated Brittany Jones's Sixth Amendment rights.

## VI.    STATEMENT OF FACTS

Zamari[1] and Tierra,[2] both minor females, were residents of Youth for Tomorrow in Bristow, Virginia. On April 24, 2019, the girls ran away from Youth for Tomorrow and began making their way to Washington, D.C. When the girls left, they had with them only their clothes and a bookbag.). When the girls ran away, they were under the age of 18. (App 0511-0513 Lines 24-25; 1-25; 1-7; App 0515-0516 Lines 24-25; 1-4).

Once the girls made it to Washington, DC, on April 25, 2019, they met a man named Curtis Fowler ("Mr. Fowler"), who the girls referenced as "Chuckie," outside of his apartment at 2914 Park Boulevard. (App 0545 Lines 7-9) (17p80). The girls inquired from Mr. Fowler how they could make money. (App 0891 Lines 21-23). At this point Mr. Fowler believed the girls to be over the age of 18. (App 0893 Lines 15-17). Mr. Fowler then took the girls to his mother's house where he had sex with Zamari. (App 546 Lines 11-12) (App 0894-895 Lines 25; 1-2). Mr. Fowler was the first person to broach the topic of the girls engaging in commercial sex. (App 0895

---

[1] Due to the nature of the allegations involved in this case, Zamari's last name was not made known to the jury. Throughout the remainder of this brief, she will be referred to by her first name.

[2] Due to the nature of the allegations involved in this case, Tierra's last name was not made known to the jury. Throughout the remainder of this brief, she will be referred to by her first name.

Lines 18-25). It is undisputed that Ms. Jones was not involved in or present during the initial encounter.

Not wanting to stay at his mother's house, Mr. Fowler called Brittany Jones, to take him and the girls to pick up Dyamond Smith ("Dyamond")—a friend of Mr. Fowler—and go to her house. (App 0898 Lines 16-21). This was the first time the girls met Brittany Jones. Mr. Fowler called Brittany Jones because he knew she threw stripper parties, and because he knew the girls wanted to make money. (App 0899 Lines 12-20). Brittany Jones picked the three of them up in her gray Chrysler and discussed the proposition of splitting the money they would make that night with Mr. Fowler. (App 900 Lines 15-20).

With Mr. Fowler and the girls in the car, Brittany Jones picked up Dyamond. (App 1091 Line 1-6)). The five of them went to Dyamond's house at 5836 Everhart Place in Temple Hills, Maryland. (App 1094-1095 Lines 23-25; lines 1-6) (17p79). Once they arrived at Dyamond's house, Brittany Jones discovered there was no electricity at the house, and no stripper party as Mr. Fowler had led her to believe. (App 1096 Lines 9-12). Dyamond then gave some clothes to Brittany Jones and went upstairs to have sex with Mr. Fowler. (App 1101 Lines 1-17). When Dyamond came down a little while later, the girls were wearing the clothes, and Brittany Jones was taking pictures of them on her phone. (App 903 Lines 9-20) (App 1102 Lines 3-8). Dyamond then joined the girls taking photos. (App 1102 11-13). While the

- 4 -

five of them were at Dyamond's house, Mr. Fowler and Brittany Jones began discussing "outcalls." (App 1104 Lines 4-5). Mr. Fowler tried to post the photos taken at Dyamond's house on a site for commercial sex that night, but no commercial sex dates occurred as a result of the ad. (App 1107 Line 11-14) (13p81) (Exhibit 111). Mr. Fowler gave no indication that Ms. Jones was involved in the prostitution or human trafficking.

## A.    The Commercial Sex Operation and Undercover Investigation:

According to the Trial testimony, at some point, Brittany Jones made a phone call after arriving at Dyamond's house to Willis Pierre Lewis ("Mr. Lewis") and Ashley Taylor ("Ms. Talyor") telling them that she had two girls trying to work. (App 1344 Line 14-19). Later that night, after leaving the girls at Dyamond's house, Brittany Jones meets up with Ms. Taylor, Mr. Lewis and a man named Rico at a house party. (App 1342 Lines 2-5). The next morning, because she could not drive, Brittany Jones drove Ms. Taylor to Dyamond's house to pick up the girls. (App 1348 Lines 10-16). Ms. Taylor was going to the house to pick up the girls to bring them back to Mr. Lewis. (App 1352 Lines 5-15). Ms. Taylor asked the girls their age and asked if they wanted to come with her to Mr. Lewis; the girls went with Ms. Taylor. (App1353 Lines 18-25). Ms. Taylor's intention of going and picking up the girls was to have them engage in commercial sex at the direction of her and Mr. Lewis. (App1353 Lines 8-10).

After picking the girls up from Dyamond's house, Brittany Jones drove Ms. Taylor and the girls straight to Mr. Lewis's house on Brookside Road in Temple Hills, Maryland. (App 1354 Lines 2-5). Brittany Jones leaves the girls at this point and drives away. (App 1356 Lines 2-4). Once at Mr. Lewis's house, the girls posted themselves on a commercial sex website to perform outcalls. (App1355 Lines17-20). At this point, the girls are instructed to make money through commercial sex work and are taken back to the Park Boulevard address by Mr. Lewis and Ms. Taylor in Mr. Lewis's vehicle. While in Mr. Lewis's vehicle out front of the Park Boulevard address, Ms. Taylor instructs the girls to sign a loyalty contract. (App 0659 Lines 6-11) (App1356 Lines 5-17) (App 1358 Lines 15-17). The loyalty contract the girls signed was with Esquire Entertainment, a "company" Mr. Lewis "owned." (App 0919 Line 20-25 and App 1065 lines 2-6). When the girls signed the loyalty contract, they were informed they would get 70% and Mr. Lewis would get 30% of all money collected from commercial sex dates. (App 1051 Line 7-9) (App 1377 Lines 5-8).

While at the Park Boulevard address, Zamari had a client that wanted her to perform an outcall in Greenbelt Maryland. (App 1358 Lines 9-10). Mr. Lewis did not have any gas in his vehicle, so Brittany Jones was called to drive the girls to Greenbelt Maryland for the outcall. (App 1361 Lines 7-8). Brittany Jones comes and picks the girls in her Chrysler, leaves Ms. Taylor and Mr. Lewis behind, and drives the girls up to Greenbelt. (App 1361 Lines 19-21). The date in Greenbelt was

unsuccessful, no commercial sex occurred, and there was no money exchanged. (App 1364 Lines 18-21). Brittany Jones brought the girls back to the Park Boulevard address where Ms. Taylor and Mr. Lewis were. (App 1365 Lines 4-5). Unhappy that no commercial sex occurred, Mr. Lewis was angry with Brittany Jones and threatened violence against her. Because of this, Brittany Jones leaves and has no further interaction with the girls, Ms. Taylor, or Mr. Lewis. (App 1367 Lines 13-25).

The same night of the unsuccessful Greenbelt date, and Brittany Jones leaving, Ms. Taylor and Mr. Lewis take the girls to a Motel 6 on Allentown Road in Maryland. (App 1369 Lines 5-10). Once at the Motel 6, Ms. Taylor takes photos of the girls on a phone to be used in ads for commercial sex. (App 1370-1371 Lines 23-25; Line 1-6) (Exhibit 72E). The phone number connected to the ad is (240) 817-0481 which is a burner phone Ms. Taylor was using to set up the commercial sex dates. (App 1373 Lines 4-23). Clients would call or text the number on the ad for sex with Zamari or Tierra. (App 1375 Lines 22-24). That night, the girls engaged in multiple commercial sex dates as a result of the photos taken by Ms. Taylor and the ad posted by her at the Motel 6. (App 1376 Lines 1-4).

Over the course of the next few weeks the girls engaged in commercial sex at the direction of Mr. Lewis and Ms. Taylor. (App 1477 Lines 1-12). In order to facilitate payment of the commercial sex dates, Ms. Tayor and Mr. Lewis utilized CashApp. (App 1456 Lines 7-15). During the time Zamari was at the Motel 6, she

did approximately 8-12 commercial sex dates per day. (App 1461 Lines 10-12).  Mr. Lewis, Ms. Taylor, and the girls were at the Motel 6 for approximately two to three nights. (App 1428-1429 Lines 24-25; 1-2).  When they left the Motel 6, the four of them went to the Econolodge in Clinton Maryland for a few days. (App 1429 Lines 9-10).  While at the Econolodge, the girls were doing 10-15 commercial sex dates per day. (App 1430 Lines 15-17). Ms. Taylor and Mr. Lewis also took the girls to Rico's house located at 1414 Southview Drive. (App 1437 Lines 9-10) (17p80).

While at Rico's house, Mr. Lewis directed the girls to engage in sex with Rico to be recorded and posted online. (App 1438 Lines 14-19).   Mr. Lewis and Ms. Taylor then took the girls to Washington, D.C where Zamari engaged in a commercial sex date. (App 1445 Lines 13-20).  Once Mr. Lewis, Ms. Taylor, and the girls left the party in D.C. they headed back to Rico's apartment in Maryland for a few days. (App 1445 Lines 10-16).  While at Rico's house, the girls performed multiple commercial sex dates. (App 1448-1449 Lines 18-25; 1-4).

Tierra decides to leave after about two weeks with Mr. Lewis and Ms. Taylor. (App 1460 Lines 8-11) (App 1477 lines 1-4).  When Tierra leaves, the four of them were staying at the Econolodge in Clinton. (App 1460 Lines 8-11).  Mr. Lewis, Ms. Taylor, and Zamari then go to the Motel 6 for about a week where Zamari engaged in commercial sex dates. (App 1461 Lines 2-4). When Tierra left, Mr. Lewis made

Ms. Taylor recruit other females. (App 1469 Lines 20-24). Ms. Taylor posted a recruitment ad on social media.

Officer Candice Wilks ("Officer Wilks"), an investigator with the Metropolitan Police Department, worked as an undercover officer in the Human Trafficking Unit. (App 1140 Lines 13-15). Officer Wilks, in an undercover capacity as "Jazzy," responded to the ad posted by Ms. Taylor, and called her about being recruited to perform commercial sex. (App 1143-1144 Lines 24-25; lines 1-4). (Exhibit 89). Ms. Taylor told Officer Wilks she handled the girls. (App 1146-1147 Lines 21-25;1-7). During the call, Officer Wilks discussed with Ms. Taylor various aspects of commercial sex. (App1148 lines 8-15). In a subsequent call, Ms. Taylor asked Officer Wilks to send her photos so that Ms. Taylor could post her on the commercial sex website. (App 1151-1152 Lines 20-9) (Exhibit 86). In a third call, Officer Wilks, and Ms. Taylor—with Mr. Lewis in the background—were supposed to meet up, however, that meet up never occurred. (App 1158 Lines 23-24) (Exhibit 87).

About a week after Tierra left, Zamari left. (App 1477 Lines 7-12) (App 1463 Lines 14-20). When Zamari left Mr. Lewis and Ms. Taylor, she was staying with another adult within the same Motel 6. (App 1912 Lines 6-8).

- 9 -

During the entire time the girls were with Ms. Taylor and Mr. Lewis, all of the money being made was going to Mr. Lewis, Ms. Taylor received no money from the commercial sex dates. (App 1463 Lines 1-4).

## B. Formal Investigation into the Commercial Sex Operation:

On May 13, 2019, after being notified by the National Center for Missing and Exploited Children, Special Agent Alix Skelton ("Agent Skelton") began investigating a missing juvenile (Zamari). (App 1910 Lines 12-22). Zamari was recovered by the FBI and Prince William County Police Department at the Motel 6 with another adult. (App 1912 Lines 1-8). Tierra was also located in California. (App 1912 Lines 19-24). Both girls were interviewed by Agent Skelton. (App 1912-1913 Lines 25; 1-5). The girls indicated that Ms. Taylor, Mr. Fowler, Mr. Lewis, Ronda Manns[3], Dyamond and Brittany Jones were involved in the commercial sex operation. (App 2037-8 Lines18-25; 1-8). Zamari informed the authorities that Mr. Lewis was the person controlling her commercial sex activities and profiting from them. (App 2041-42 Lines 23-25; 1-7). A formal investigation is commenced at this point.

---

[3] Ronda Manns is Mr. Lewis's wife. The CashApp that was utilized by Mr. Lewis to facilitate payments for the commercial sex operation was connected to Ms. Manns. At various times, Ms. Manns also had interactions with the girls.

As part of the initial investigation, a subpoena returned information related to Brittany Jones including an email address Bossyhoncho@gmail.com and a phone number (202) 760-7985. (App 2046 Lines 1-2, 11, 17) (Exhibit 50). There were also records that Brittany Jones was in contact with Mr. Lewis and was associated to a TextNow number connected to a MegaPersonals ad used for commercial sex. (App 2047 Lines 8-9, 21) (Exhibit 58A). Brittany Jones, Mr. Lewis, Mr. Fowler, Rico, and Ms. Taylor were all arrested pursuant to arrest warrants. (App 2060 Lines 18-22). Upon their arrests, various cellphones, a computer, and other items were retrieved and sent for further analysis. (App 0745-0746 Lines 6-25; 1-24; 1-22). Once the investigation was established, the dates of the investigation, which corresponded to the dates of the charged conspiracy, were narrowed to April 25, 2019 through May 11, 2019. (App 0745 Lines 1-4).

Once the data from the confiscated devices was extracted, the information was analyzed. A series of messages between Brittany Jones's phone and a cellphone ending in -4350 on April 21, 2019, at around 7:30 p.m. were discovered. The messages discussed "fuck parties" and wanting to bring two (2) individuals to this party.[4] (App 0754 Line 20-21). Communications between Ms. Jones and Rico on

---

[4] These text messages were sent and received at least 3 days prior to the charged conspiracy and prior to the time Brittany Jones met the girls.

April 22, 2019, were found discussing them finding some girls for a party.[5] (App 0790, 0791 Lines23-24; 8-22) (Exhibit 77B). On April 27, 2019, at roughly 12:40 p.m. there is an email forwarded from Ms. Lewis to Brittany Jones with the subject line "Loyalty Contract." (App 0759-0760 Lines 20-25;1-2).  On April 27, 2019, at roughly 1:15 a.m. there is an email from megapersonals to an email address associated with Brittany Jones. (App 0758 Lines 6-7).

Further, as part of the investigation into Brittany Jones' involvement, Special Agent Mathew Wilde ("Agent Wilde") from the FBI Analysis Survey Team compared the historical cellphone records of Brittany Jones to a series of known date and time locations. (App 1801 Lines 15-18).  These comparisons to historical phone records were used to map out approximate locations of Brittany Jones at various times.

C. **The case of the *United States of America v. Brittany Jones and Willis Pierre Lewis*:**

On October 17, 2019, the grand jury returned a 15 count Indictment charging Mr. Lewis, Brittany Jones, Dyamond, and Ronda Manns as being co-conspirators in the commercial sex operation. Of the 15 counts contained within the Indictment, Brittany Jones was charged with the following counts:

3. Sex Trafficking of Minors, in violation of 18 USC §§1591(a)(1), (a)(2), and (b)(2);

---

[5] See footnote 5, *supra*.

- 12 -

4. Sex Trafficking of Minors, in violation of 18 USC §§1591(a)(1), (a)(2), and (b)(2):

5. Conspiracy to Sex Traffic Minors, in violation of 18 USC §1594(c);

6. Transportation of a minor with Intent to Engage in Criminal Sexual Activity, in violation of 18 USC §2423(a);

7. Transportation of a Minor with Intent to Engage in Criminal Sexual Activity, in violation of 18 USC §2423(a);

8. Conspiracy to Transport Minors with Intent to Engage in Criminal Sexual Activity, in violation of 18 USC §2423(e);

9. Transportation, in violation of 18 USC §2421(a);

10. Transportation, in violation of 18 USC §2421(a);

11. Interstate Travel and Transportation in Aid of Racketeering, in violation of 18 USC §1952(a)(3)(A).

For all of the counts alleged against Brittany Jones, the conduct is alleged to have taken place between April 25, 2019, and May 11, 2019.

On May 5, 2022, a trial by jury was commenced for Mr. Lewis and Brittany Jones.[6] At trial, the Government put on various witnesses; both fact and expert. The Government called Kaitlyn Barbour from Youth for Tomorrow; Zamari, Special Agent Laura Calvillo, Mr. Fowler, Dyamond, Agent Wilks, Dr. Sharon Cooper,

---

[6] Prior to trial, Dyamond and Ms. Manns entered into plea deals to various charges in the indictment that included a requirement they testify at trial.

Ms. Taylor, Agent Wilde, David Snyder, Agent Skelton, and Ms. Manns.  Ernest McIntosh ("trial counsel") called three Character witnesses on behalf of Brittany Jones.

Special Agent Laura Calvillo ("Agent Calvillo") from the FBI testified regarding the data extracted from the various phones seized as part of the investigation. (App 0745-0746 Lines 6-25; 1-23).  The cellphone seizure data was crucial in the case against Brittany Jones.  In particular, Agent Calvillo was shown Exhibit 80 which was an extraction report for the phone number associated with Brittany Jones. (App 0749-0750 Lines 22-25;1-3, 21-25) (Exhibit 80).  In particular Agent Calvillo testified to a text conversation between Brittany Jones and another cellphone ending in -4350 on **April 21, 2019**, the contents of the conversation were read into the record:

A.    Okay.  So, from Bossyhoncho on April 21st, 2019, at 7:32 p.m., "Wassup"

Q.    Okay. And the phone number ending in 4350 says, "Hey, what's up. You got the flyers?"

A.    Okay. From Bossyhoncho, "How many ladies you think I can bring?"

Q.    And then 4350 responds, "Maybe two."

A.    From Bossyhoncho, "Yes."

Q.    4350 says, "Maybe, though."

A.    So, from Bossyhoncho, "They work or dance?"

- 14 -

Q.    4350 says, "No, but they're down. How many girls you got coming?"

A.    Bossyhoncho, "Cool.' And then Bossyhoncho, "it starts at 11."

Q.    "Where at? How many girls?"

A.    "Suitland."

Q.    "You got the address?"

A.    "Marlow Heights."

A.    "Yes. Every week usually,"

Q.    Okay.

A.    "It's ten for the fellows. Ladies free all night."

Q.    "It be a lot of girls?"

A.    "Yes, but I'm trying to recruit more that actually want to make some money."

Q.    "And this is a fuck party; right? How much the girls be charging?"

A.    "This is an adult party. So yes, ladies can dance or take dates. We take 30 percent for hosting. Ladies keep everything else they make. We can help with pricing, but the ladies usually have their own prices.

Q.    So, all of those messages we just read were from April 21st of 2019; is that correct"

A.    That's correct.

(App 0753-0755 Lines 20-25; 1-25; 1-7).

The messages read and introduced as part of Exhibit 80 took place on **April 21, 2019**, more than 3 days before the girls ever left Youth for Tomorrow, and before

- 15 -

Brittany Jones ever meets them.  Trial counsel, did not object to these messages coming into evidence or being read to the jury.

The Government also called Agent Wilde who authored the report comparing the historical cellphone records of Brittany Jones to various known cellphone towers. (App 1805 Lines 9-10) (Exhibit 95).  Agent Wilde testified that the data does not provide a precise location; the best it can do is an approximation. (App 1800 Lines 2-13).  Agent Wilde testified directly from his report that on April 27, 2019, between 2:00 a.m. and 2:30 a.m. Brittany Jones's phone was pinging off towers near Suitland Parkway and 295, between 11:11 a.m. and 11:56 a.m. her phone pinged from a tower near Pennsylvania Avenue  and ends up pinging off a tower near 5836 Everhart Place moving southwest; from 11:56 a.m. to 2:25 p.m. her phone is on the move pinging on a tower near 3914 Park Boulevard in Suitland Maryland; around 5:30 p.m. her cell phone leaves the towers near Park Boulevard and by 6:12 p.m. it is pinging off a tower in Greenbelt Maryland; and then at 8:25 p.m. and 9:41 p.m. her cellphone is pinging off towers near Park Boulevard. (App 1811-1815 Lines 4-25;1-25;1-25;1-25; 1-18) (Exhibit 95).  Trial counsel did not cross examine Agent Wilde, nor did he object to his report being introduced into evidence.

At the close of the Government's case, Mr. Lewis moved for judgment of acquittal on all counts, which was denied. (App 2171-2173 Lines 12-25; 1-17).  Trial counsel then moved for judgment as a matter of law on two grounds. (App 2172

- 16 -

Lines 19-22, 1-25,1-7).  The first being there was insufficient evidence to convict

Brittany Jones. (2172-2173 18a48-49).   The second being that dismissal was

warranted to the counts of conspiracy (counts 5 and 8) because while one conspiracy

was charged in the indictment, there were multiple conspiracies proven at trial.

(18a49).  In support of his motion trial counsel argued:

> …what we have here is not a single conspiracy as charged in the indictment, but we have multiple conspiracies…I would say the first conspiracy properly charged would be between Fowler, [Brittany Jones], and Dyamond because they interacted with the alleged victims first. And as the evidence goes on, then [Mr.] Lewis, [Ms.] Taylor, and Rodrick Barton interacted with the victims secondly, and those are two distinct groups.
>
> Now, the standard for conspiracy is whether the conspirators had a common goal. Well, obviously, in conspiracy 2, [Mr.] Lewis, [Ms.] Taylor], and Barton and Ronda Manns had nothing in common with what was going on in conspiracy 1, [Mr.] Fowler, [Brittany Jones], and Dyamond.
>
> Second, to prove a conspiracy, degree of interdependence. There's no evidence of any interdependence between these two discrete groups.
>
> Three, overlap of participants. If you look at all of the evidence, there was no overlap between group 1 and group 2.
>
> Now, so what the evidence has shown is a variance between the conspiracy that was changed, and the conspiracy supported by the evidence. So, if a variance is established to show multiple conspiracies, then the single conspiracy charged in the indictment must be dismissed.

- 17 -

The court denied trial counsel's motion. (App 2172-2174 Lines 22-25;1-25;1-7).   After Mr. Lewis argued unfairness by the Government not calling Tierra as a witness, portions of her grand jury testimony were to be read into the record.

Trial counsel only called three character witnesses on Brittany Jones's behalf.

At the conclusion of the trial on May 23, 2022, the jury found Brittany Jones guilty of counts 3, 4, 5, and 11 of the superseding indictment; she was acquitted of counts 6, 7, 8, 9, and 10.

On March 3, 2023, Brittany Jones appeared for sentencing before the Honorable Royce C. Lamberth[7]. On counts 3, 4, and 5, Brittany Jones was sentenced to 168 months of incarceration, concurrently with count 11 of 60 months. (Sentencing 15).  Brittany Jones was further sentenced to 120 months of supervised release on counts 3, 4, 5, and 36 months for count 11. (Sentencing 15).  Brittany Jones was ordered to pay restitution of $6,000. (Sentencing 15-16).  At the end of her sentencing, Brittany Jones was apprised of her appeal rights. (Sentencing 19-20).

Brittany Jones's appeal to this Court timely followed.

---

[7] Brittany Jones was represented by undersigned at her sentencing hearing. No issues concerning her sentencing are being appealed.

- 18 -

## VII.   SUMMARY OF ARGUMENT

There was an impermissible variance between the single conspiracy charged in count 5 of the indictment and the evidence presented at trial.  Such variance prejudiced Brittany Jones, warranting her conviction as to count 5 be vacated.

Trial counsel rendered ineffective assistance of counsel by failing to conduct a proper investigation into the accuracy and credibility of the report Agent Wilde authored and testified from at trial, and his failure to cross-examine Agent Wilde. Additionally, trial counsel rendered infective assistance of counsel by not objecting to evidence of text communications occurring prior to the charged conspiracy from being introduced at trial which were improperly used to show Brittany Jones's propensity to engage in commercial sex trafficking.

## VIII.  Argument

## I.     BRITTANY JONES'S CONVICTION OF COUNT 5 WAS THE RESULT OF A PREJUDICIAL VARIANCE FROM THE SINGE CONSPIRACY CHARGED IN THE INDICTMENT TO THE EVIDENCE OF MULTIPLE CONSPIRACIES AT TRIAL.

Brittany Jones challenges her conviction as to count 5 as there was insufficient evidence to convict her.  The indictment charged one single conspiracy spanning from April 25, 2019, through May 11, 2019, however the evidence presented at trial varied from the indictment in that two conspiracies were presented.  Due to this

variance, Brittany Jones's conviction as to count 5 for "Conspiracy to Sex Traffic Minors, in violation of 18 USC §1594(c)" should be vacated.

Trial counsel raised this issue as part of his judgment as a matter of law. Trial counsel pointed out that two conspiracies were proven; the first being between Mr. Fowler, Brittany Jones and Dyamond, and the second being between Mr. Lewis, Ms. Taylor, and Rodrick Barton. The district court summarily denied the motion.

When an indictment "alleges a single conspiracy but the evidence at trial shows multiple conspiracies, the variance between the indictment and the proof, if it is prejudicial, is reversable error." *United States v. Fahra*, 643 Fed.Appx. 480, 490 (D.C. Cir. 2016) (citing *United States v. Hughes*, 505 F.3d 578, 687 (6th Cir. 2007)); *Gaither v. United States*, 413 F.2d 1061, 1071 (D.C. Cir. 1969) ("A variance occurs when the charged terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different form those alleged in the indictment."). "A variance occurs when the charging terms of the indictment are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *Fahra*, 643 Fed. Appx. at 490.

A variance can be shown where "the Brittany Jones proves (1) that the evidence at trial established facts materially variant form those alleged in the indictment, and (2) that the variance caused substantial prejudice." *United States v. Tarantino*, 846 F.2d 1384, 1391 (D.C. Cir. 1988); *United States v. Gaviria*, 116 F.3d

- 20 -

1498, 1516 (D.C. Cir. 1997); *United States v. Eiland*, 525 F.Supp. 2d 37, 41 (D.D.C. 2007); *United States v. Caporale*, 806 F.2d 1487, 1499-1500 (11th Cir. 1986).  In considering whether a variance is present, this Court will review the evidence presented at trial in a light most favorable to the prosecution—by the guilty verdicts rendered by the jury—and "determine whether the prosecution proves a single conspiracy as alleged in the indictment, or whether, instead, its proof was a material and prejudicial variance from the indictment, warranting acquittal." *Fahra*, 643 Fed. Appx. at 492. In doing so, this Court will look at "whether the defendants shared a common goal, any interdependence among the participants, and any overlap among the participants in the allegedly separate conspiracies." *United States v. Mathis*, 216 F.3d 18, 23 (DC. Cir. 2000) (citing *Gaviria*, 116 F.3d at 1533).

The indictment in this case charged a single conspiracy taking place between April 25, 2019, and May 11, 2019, charging Brittany Jones, Mr. Lewis, Dyamond, and Ronda Manns as co-defendant among the 15-count indictment.  While the particular counts charged to each co-defendant varied, each was charged with count 5 for "Conspiracy to Sex Traffic Minors, in violation of 18 USC §1594(c)."  Thus, count 5 of the indictment charged one overarching conspiracy among all co-defendants.

While the indictment charged one conspiracy, the evidence presented at trial clearly presents two very distinct conspiracies.

- 21 -

The first conspiracy begins on or about April 24, 2019, when the girls meet Mr. Fowler. (App 0893Line 15-16). The girls then spend the night with Mr. Fowler and met Brittany Jones the very next evening who took them to Dyamond's house. (App 0893 Lines24-25). While at Dyamond's house, photos were taken of the girls with Brittany Jones and an ad for commercial sex dates was posted, but no commercial sex dates involving the girls occurred. (App 1107 Lines 11-14) (13p81) (Exhibit 111). Later that same night, Brittany Jones has a conversation with Mr. Lewis and Ms. Taylor, about the girls working for Mr. Lewis and Ms. Taylor. (App 1344-1345 Lines 17-25; 1-9). The next morning, Brittany Jones brings the girls to Mr. Lewis and Ms. Taylor. (App 1354 Lines 2-4). There is no evidence that this conversation led to an agreement a to compensation to be paid to Brittany Jones. On the same day, Brittany Jones is called to take the girls to Greenbelt for Zamari to visit a client she had for commercial sex. (App 1361 Lines 7-9). Without Mr. Lewis or Ms. Taylor in the vehicle, Brittany Jones takes the girls to Greenbelt, but again no commercial sex occurs. (App 1364 Lines 18-21). When Brittany Jones returned the girls, Mr. Lewis—angry that no commercial sex took place—threatens violence against Brittany Jones. (App 1367 Lines 10-25). Brittany Jones then leaves, and never has another interaction with the girls. (App 1368 Lines 17-19). In total, Brittany Jones is with the girls for less than 24 hours. The first conspiracy ends here.

- 22 -

The second conspiracy begins as soon as Brittany Jones leaves the girls after the unsuccessful Greenbelt date. Over the course of the next few weeks, the girls engaged in commercial sex dates at the direction of Mr. Lewis and Ms. Taylor— without any involvement of Brittany Jones. Mr. Lewis and Ms. Taylor moved the girls from Mr. Lewis's residence to a Motel 6 where the girls engaged in multiple commercial sex dates in which Mr. Lewis received financial benefit. (App 1369 Lines 5-12) (App1375-1376 Lines 22-25; 1-4). After Mr. Lewis, Ms. Taylor and the girls left the Motel 6, they went to the Econolodge where the girls continued to engage in commercial sex dates, until Tierra and Zamari leave. (App 1430 Lines 15-17) (App 1459 Lines 8-10) (App 1477 Lines 1-12).

Importantly, there was no overlap as contemplated in *Mathis* and *Gaviria* from the first conspiracy to the second. This is evident by the violence threatened by Mr. Lewis against Brittany Jones due to the unsuccessful commercial sex date in Greenbelt. (App 1368 Lines 10-16). Brittany Jones is not a main figure in the second conspiracy, nor can it be said that Brittany Jones and Mr. Lewis worked together to facilitate commercial sex dates to derive financial benefit. *See United States v. Hitt,* 2000 U.S. Dist. LEXIS 9931, \*12 (D.D.C. 2000) ("Since the existence of an agreement is the essential element of the statutory crime of conspiracy, the government must establish a unity of purpose, an intent to achieve a common goal, and an agreement to work together in order to convict a criminal defendant of

- 23 -

conspiracy.") (citations omitted). Based off the interaction between Mr. Lewis and Brittany Jones after the Greenbelt date—and the clear absence of Brittany Jones beyond that date—there cannot be said to be an intent to achieve a common goal or an agreement to work together for any action that took place beyond that point; which is when the second conspiracy begins. *Id*. This clearly shows a variance between the evidence at trial in two distinct conspiracies, and that of a single conspiracy charged in count 5 of the indictment. *Tarantino*, 846 F.2d at 1391. With the first element shown, the question then turns to the prejudice suffered by Brittany Jones from that variance. *Id*.

By allowing the prosecution to present evidence under the guise of one charged conspiracy, but in fact comprising of two conspiracies the jury was substantially likely to transfer evidence from the conspiracy solely involving Mr. Lewis to Brittany Jones. Such a transfer was prejudicial to Brittany Jones. *Id*. Unlike in *Eiland*, where the court read a jury instruction specifically addressing multiple conspiracies, no such instruction was read to the jury that convicted Brittany Jones. *Eiland*, 525 F.Supp.2d at 45-46.[8] Given the overwhelming evidence

---

[8] The following instruction was read to the jury in *Eiland*:

> "[i]f you [the jury] find that the evidence at trial did not prove the existence of the single overall conspiracy charged, or instead established other or different conspiracies, none of which are charged in the indictment, you must find the defendants not guilty."

of Mr. Lewis's guilt, it is substantially likely that the jury could have transferred evidence from the conspiracies Mr. Lewis was charged with to that of Brittany Jones. This amounts to prejudice, warranting the vacating of her conviction as to count 5 of the indictment. *Tarantino*, 846 F.2d at 1391.

The evidence demonstrates there were two conspiracies presented by the Government. This is a variance from the single conspiracy charged in the indictment to the materially different evidence presented at trial. *Gaither*, 413 F.2d at 1071. Due to this impermissible variance, there was insufficient evidence to demonstrate she was engaged in the single conspiracy a charged in count 5 of the indictment to commit the crime alleged in 3 of the indictment with Mr. Lewis. Such an impermissible variance prejudiced Brittany Jones leading to her conviction of count 5. Trial counsel's motion for judgment as to count 5 due to this variance should have been granted, and this Court should vacate Brittany Jones's conviction as to count 5.

## II.    TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL TO BRITTANY JONES THAT VIOLATED HER SIXTH AMENDMENT RIGHTS.

---

*Eiland*, 525 F.Supp.2d at 45. The court went on to say. "[s]uch an instruction clearly, carefully, and concisely delineates the situations under which the jury could find the defendants guilty and not guilty of conspiracy. *Id*. at 46.

At the outset, it should be noted that a direct appeal, as Brittany Jones is taking here, is a proper avenue to present claims for ineffective assistance of trial counsel. *United States v. Henry*, 472 F.3d 910, 915 (D.C. Cir. 2007). Undersigned counsel did not serve as trial counsel. *See United States v. Weaver*, 281 F.3d 228, 234 (D.C. Cir. 2002) (through new counsel, a defendant can raise a claim for ineffective assistance of counsel for the first time on direct appeal because "trial counsel cannot be expected to argue his own ineffectiveness in a motion for a new trial.").

Claims of ineffective assistance of counsel are analyzed through the lens of *Strickland v. Washington*, 466 U.S. 668 (1984) and its progeny.  *Strickland* recognized the Sixth Amendment right to counsel to "protect the fundamental right to a fair trial." *Id*. at 684 (citing U.S. Const., Amend. VI).  The Supreme Court has long recognized that a pilar of our judiciary is "the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771, n.14 (1970). A criminal defendant can be deprived of the right to effective assistance, by trial counsel failing to render "adequate legal assistance."  *Strickland*, 466 U.S. at 686.  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id*.

This Court has held the two-part test established by *Strickland* for ineffective assistance claims is whether "(1) counsel's representation fell below an objective

standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *United States v. Weathers*, 493 F.3d 229, 232 (D.C. Cir. 2007) (citing *Strickland*, 466 U.S. at 688, 694). If Brittany Jones can make both showings, the conviction is then said to have "resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland,* 466 U.S. at 687.

Under *Strickland's* first prong, a defendant carries the burden to demonstrate that trial counsel's representation fell below an objective standard of reasonableness as it relates to prevailing professional norms. *Id*. at 688. Once an unprofessional error of trial counsel is singled out, to satisfy the second prong, Brittany Jones carries the burden to show but for trial counsel's errors, there is a "reasonable probability" the result of the proceeding would have been different. *Id.* at 698. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the trial. *Id*. at 694.

When a claim for ineffective assistance of counsel is raised for the first time on appeal—as Brittany Jones is doing—the general practice of this Court is to remand the claim for an evidentiary hearing unless the claim can be decided solely on the record. *United States v. Shabban*, 612 F.3d 693, 698 (D.C. Cir. 2010).

Each unprofessional error of trial counsel is discussed in greater detail herein.

- 27 -

A. **Trial Counsel Rendered Ineffective Assistance Of Counsel By Not Adequately Investigating Possible Impeachment Evidence To Attack The Critical Cellphone Extraction Data Presented Against Brittany Jones.**

Crucial to the Government's case against Brittany Jones was historical cellphone extraction data and tracking data from her cellphone pinging off various cellphone towers. Absent from trial counsel's trial strategy was the presentation of any evidence to attack the reliability or accuracy of this data in his defense of Brittany Jones. Such deficient act fell below the objective standard of reasonableness and prejudiced Brittany Jones. *Stickland*, 466 U.S. at 694, 98.

Trial counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. "A lawyer who fails adequately to investigate, and to introduce into evidence, [information] that demonstrates his client's factual innocence, or that raises sufficient doubts as to that question to undermine confidence in the verdict, renders deficient performance." *Lord v. Wood*, 184 F.3d 1083, 1093 (9th Cir. 1999); *see also Tucker v. Ozmint*, 350 F.3d 433, 444 (4th Cir. 2003) ("Trial counsel have an obligation to investigate possible methods for impeaching a prosecution witness, and failure to do so may constitute ineffective assistance of counsel."). While trial counsel is generally afforded leeway in making decision as to trial strategy, "counsel cannot be said to have made a tactical decision **without first procuring the information necessary to make such a decision**." *Reynoso v. Giurbino*, 462 F.3d

- 28 -

1099, 1113 (9th Cir. 2006) (emphasis added); *Engle v. Isaac*, 456 U.S. 107, 133-34 (1982).

Trial counsel's failure to investigate the unreliability of the cellphone tracking data presented against Brittany Jones to demonstrate her location constitutes ineffective assistance of counsel. Brittany Jones was never informed by trial counsel as to whether he conducted any investigation into the accuracy of such evidence, if he attempted to locate an expert that would challenge the testimony presented by the Government, or if he retained anyone to independently verify the reliability of the data.[9]

Using cell phone towers to try and triangulate a person's location has been a questioned science for many years. A simple search by trial counsel would have populated articles questioning its accuracy,[10] as well as found insistences where the use of such data is being challenged across the county.[11] Armed with this

---

[9] Officer Wilde testified that he would have spoken to defense counsel if contacted by them. However, there is no indication that Mr. McIntosh ever communicated with Officer Wilde.

[10] Dixon, H. B., American Bar Association, *Scientific fact or junk science? tracking a cell phone without GPS. Scientific Fact or Junk Science? Tracking a Cell Phone without GPS*. Jan. 1, 2014.

[11] Jackman, T. (2014, June 27). *Experts say law enforcement's use of cellphone records can be inaccurate*. The Washington Post. https://www.washingtonpost.com/local/experts-say-law-enforcements-use-of-

information, a prudent attorney would engage in an independent expert or further investigated this science as this would be a crucial part of the Government's case against Brittany Jones. Trial counsel failed to do such investigation.

Trial counsel's lack of investigation into the accuracy or reliability of the cellphone tracking data is further amplified by the fact he did not cross-examine Agent Wilde at all; which would have been the appropriate time to attack the locational accuracy of his analysis. *See United States v. Pembrook*, 119 F.Supp. 3d 577, 597-98 (E.D. Mich. 2015) (the accuracy of the Agent's testimony as to where cellphones are located at particular times are best to be challenged on cross-examination). This act alone certainly falls below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688; *Reynoso*, 462 F.3d at 1112 (the failure to investigate possible modes of impeachment may in and of itself constitute ineffective assistance of counsel).

Had it not been for the deficient act of trial counsel in not investigating possible impeachment and rebuttal evidence, trial counsel could have properly cross-examined Agent Wilde regarding the accuracy of the cellphone data, as it only gives

---

cellphone-records-can-be-inaccurate/2014/06/27/028be93c-faf3-11e3-932c-0a55b81f48ce_story.html

Tran, Minh, White Paper: 911 Help SMS App.

an approximate—not precise—location of the cellphone, and that the cellphone does not necessarily connect to the nearest tower it connects to the strongest tower which might produce a false location. There was no cross-examination by trial counsel as to any testimony provided by Agent Wilde. Given the important nature of this evidence presented against Brittany Jones, it is inexcusable not to further investigate the issue. Certainly, if trial counsel had done so, there is a "reasonable probability" the result of the proceeding would have been different. *Strickland*, 466 U.S. at 698.

Given trial counsel's rendering of ineffective assistance of counsel in this manner, this Court should remand this matter to the district court for a full evidentiary hearing on the issue. *Shabban*, 612 F.3d at 698.

B. ***Trial Counsel Rendered Ineffective Assistance Of Counsel By Not Objecting To Testimony Regarding Cellphone Communications Of Brittany Jones That Occurred Prior To The Alleged Conspiracy.***

Agent Calvillo testified to text message communications Brittany Jones had with an unnamed individual prior to the charged conspiracy. (App 0753-0755 Lines 20-25; 1-25; 1-7). This evidence was introduced to improperly show Brittany Jones had a propensity to engage in commercial sex trafficking. Trial counsel should have objected to the introduction of such evidence, his failure to do so constituted ineffective assistance of counsel.

The analysis for an ineffective assistance's claim changes in nature when the challenged conduct involves evidence that is alleged to have been improperly

admitted. "To prevail on an infectiveness claim premised upon counsel's failure…to object to the admission of evidence at trial, a defendant must at a minimum establish that the evidence was, in fact, wrongfully admitted." *United States v. Glover*, 174 F.Supp.3d 431, 439 (D.D.C. 2016); *United States v. Wood*, 879 F.2d 927, 934 (D.C. Cir. 1989).

Agent Calvillo was asked on the stand about a text conversation Brittany Jones had that took place on April 21, 2019. The gist of the conversation is about an adult sex party where commercial dates could be had. (App 0753-0755 Lines 20-25; 1-25; 1-7) (Exhibit 80). Importantly, this conversation takes place at least three (3) days prior to the time Brittany Jones meets the girls on or about April 24, 2019. Trial counsel, failed to object to this line of questioning regarding these phone calls which deprived Brittany Jones of a means to challenge whether the evidence should have been permitted. This failure by trial counsel fell below an objective standard of reasonableness as trial counsel failed to preserve the issue. *Strickland*, 466 U.S. at 687.

Brittany Jones suffered prejudice due to this failure because such evidence— communications prior to a charged conspiracy—have been excluded as prejudicial. *Id*. at 698; see *United States v. Ogando*, 1991 U.S. Dist. LEXIS 3774, *9 (S.D.N.Y. 1991) (Evidence of communications prior to the charged conspiracy were properly excluded as prejudicial "both because it shows a propensity to deal in drugs and

- 32 -

because of its suggestion of a connection to a prior homicide."). Due to this evidence being inadmissible, such evidence was wrongly admitted painting Brittany Jones as a person with a propensity to engage in commercial sex trafficking. *Glover*, 174 F.Supp.3d at 439; *Wood*, 879 F.2d at 934.

Based on the inadmissibility of the text conversations, Brittany Jones suffered prejudice due to trial counsel's ineffective service, and this Court should remand this matter to the district court for a full evidentiary hearing on the matter. *Shabban*, 612 F.3d at 698.

## IX.    CONCLUSION

The improper variance from the single conspiracy charged in count 5 of the indictment and the two conspiracies presented at trial warrant Brittany Jones's conviction as to count 5 vacated. Additionally, in light of the constitutional ineffectiveness of trial counsel in violation of Brittany Jones's Sixth Amendment rights, Brittany Jones respectfully requests this Court remand this action to the District Court so a full evidentiary hearing can be conducted.

Dated: February 4, 2025                                       Respectfully submitted,

                                                                              /s/ Antoini M. Jones

                                                                              Antoini M. Jones
                                                                              1401 Mercantile Lane
                                                                              Suite 300
                                                                              Largo, Maryland 20774
                                                                              (301) 277-0770

- 33 -

## CERTIFICATE OF COMPIANCE

Pursuant to Fed. R. App. P 32(a)(7)(C).  I hereby certify that this brief complies with the type-volume limitations because it contains 8014 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Cir. R. 32(a)(1).  I further certify that this brief complies with the typeface requirements of Fed. R. P. 32(a) (5) and the typeface style requirements of Fed. R. App. P. 32(a)(6) because the brief was prepared in 14-point Times New Roman font using Microsoft Word.

Dated: February 4, 2025                           /s/ Antoini M. Jones

                                                  Antoini M. Jones

## CERTIFICATE OF SERVICE

I hereby certify, pursuant to Fed. R. App. P. 25(c) and Cir. R. 25(c), that on

February 4, 2025, the foregoing was electronically filed with the Clerk of the Court using the

CM/ECF system, which will send a notification to the attorneys of record in this matter who

are registered with the Court's CM/ECF system.

Dated: February 4, 2025         /s/ Antoini M. Jones

                                     Antoini M. Jones